**SUPERINTENDENT OF INSURANCE OF the STATE OF NEW YORK, as Liquidator of Manhattan Casualty Company, Plaintiff,**

v.

**BANKERS LIFE AND CASUALTY COMPANY et al., Defendants.**

No. 63 Civ. 2490–CLB.

United States District Court,
S. D. New York.

June 3, 1975.

---

Joseph J. Marcheso by Morton J. Schlossberg, New York City, for plaintiff.

Winthrop, Stimson, Putnam & Roberts by William W. Karatz, New York City, for defendant Irving Trust Co.

Jacobs, Persinger & Parker by Isaac M. Bayda, New York City, for defendant Bankers Life.

Sullivan & Cromwell by Michael M. Maney, New York City, for defendant Belgian American Banking Corp.

Norman Annenberg, New York City, for objectants.

## MEMORANDUM DECISION

BRIEANT, District Judge.

Counsel representing (1) Harry Berg, a claimed creditor of Manhattan Casualty Company (hereinafter "Manhattan"), (2) Florence H. Brandenburg, Executrix of the Estate of Matthew H. Brandenburg, deceased, in her capacity as sole shareholder of Manhattan, and (3) Harry Berg and Florence H. Brandenburg on behalf of themselves and others as taxpayers of the State of New York, moves for an order (a) granting Berg, on behalf of himself and all creditors of Manhattan; Mrs. Brandenburg, as Ex-

ecutrix, as sole shareholder of Manhattan; and Berg and Mrs. Brandenburg as taxpayers; and on behalf of the other New York taxpayers, leave to intervene in this action for the purpose of protecting the rights of Manhattan, its creditors, shareholder and the taxpayers, (b) "enjoining the parties to this action from interposing . . . any defense based upon any judgment entered in the state court of this State, which approves a settlement agreement [to dispose of this and a related state court action] made as of June 8, 1972, and from using same to seek a dismissal of this case," (c) enjoining the parties from releasing the defendants on behalf of Manhattan of the claims asserted in this action, (d) granting the intervenors the right to amend the complaint to assert as a pendent claim the claim asserted in Supreme Court of the State of New York, County of New York, Index No. 11358/65, (e) determining that the Supreme Court of the State of New York had no jurisdiction to pass upon the fairness and reasonableness of the June 8, 1972 settlement agreement, and that any order or judgment of the courts of the State of New York is a nullity insofar as this action in this Court is concerned, (f) determining that in the state court Manhattan, its creditors and shareholder, and the taxpayers were "deprived of procedural and substantive due process", (g) disapproving the settlement agreement made as of June 8, 1972.

This litigation was initiated in this Court on August 19, 1963 by the then incumbent Superintendent of Insurance of New York (hereinafter "Superintendent"), a state official, acting pursuant to § 510 *et seq.* of the New York Insurance Law, and also an order of the Supreme Court of New York County dated May 24, 1963, which adjudged Manhattan insolvent pursuant to Article XIV of that statute and appointed the Superintendent as its Liquidator. The liquidation proceedings have continued, under the supervision of that Court, by the original plaintiff, and his successors in office since that date.

Manhattan's insolvency occurred as a result of a swindle perpetrated by one James F. Begole, acting in concert with some others, sued here, and facilitated, intentionally, innocently or negligently by the remaining defendants not actually participating in his scheme. The reader's familiarity with the unanimous opinion of the Supreme Court by Mr. Justice Douglas, delivered in this action November 8, 1971 is assumed. *Supt. of Insurance of New York v. Bankers Life & Casualty Co. et al.*, 404 U.S. 6, 92 S. Ct. 165, 30 L.Ed.2d 128. There, the Court unanimously upheld the complaint in this action, which had been dismissed on June 3, 1969 by Judge Herlands of this Court (D.C.N.Y., 300 F.Supp. 1083, *aff'd.* 2 Cir., 430 F.2d 355).

We cannot improve upon the elucidation of the facts pleaded as set forth by Mr. Justice Douglas, 404 U.S. 6, 7, 92 S.Ct. 165, 166, 30 L.Ed.2d 128 *et seq.*

"It seems that Bankers Life & Casualty Co., one of the respondents, agreed to sell all of Manhattan's stock to one Begole for $5,000,000. It is alleged that Begole conspired with one Bourne and others to pay for this stock, not out of their own funds, but with Manhattan's assets. They were alleged to have arranged, through Garvin, Bantel & Co.—a note brokerage firm—to obtain a $5,000,000 check from respondent Irving Trust Co., although they had no funds on deposit there at the time. On the same day they purchased all the stock of Manhattan from Bankers Life for $5,000,000 and as stockholders and directors, installed one Sweeny as president of Manhattan.

Manhattan then sold its United States Treasury bonds for $4,854,552.-67. [footnote omitted] That amount, plus enough cash to bring the total to $5,000,000, was credited to an account of Manhattan at Irving Trust and the

$5,000,000 Irving Trust check was charged against it. As a result, Begole owned all the stock of Manhattan, having used $5,000,000 of Manhattan's assets to purchase it.

To complete the fraudulent scheme, Irving Trust issued a second $5,000,000 check to Manhattan which Sweeny, Manhattan's new president, tendered to Belgian-American Bank & Trust Co. which issued a $5,000,000 certificate of deposit in the name of Manhattan. Sweeny endorsed the certificate of deposit over to New England Note Corp., a company alleged to be controlled by Bourne. Bourne endorsed the certificate over to Belgian-American Banking Corp. [footnote omitted] as collateral for a $5,000,000 loan from Belgian-American Banking to New England. Its proceeds were paid to Irving Trust to cover the latter's second $5,000,000 check.

Though Manhattan's assets had been depleted, its books reflected only the sale of its Government bonds and the purchase of the certificate of deposit and did not show that its assets had been used by Begole to pay for his purchase of Manhattan's shares or that the certificate of deposit had been assigned to New England and then pledged to Belgian-American Banking."

The complaint here charged a violation of § 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] and of § 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)].

Judge Herlands, in dismissing the complaint, described the activities charged against Begole and his confederates (p. 1102 of 300 F.Supp.):

"The complaint, taken as a whole, alleges no more than a common law action for misappropriation of corporate funds by a fiduciary, embezzlement or fraudulent conveyance perhaps, or the distribution of an illegal dividend. None of these actions, in the absence of diversity of citizenship, can be maintained in a federal court."

Until November 8, 1971, when the Supreme Court rendered its unanimous opinion, the views of the late Judge Herlands were widely held, and represented prevailing opinion.[1] Recognizing the likelihood that the fraud practiced upon Manhattan might not be actionable in this Court, this plaintiff had initiated companion litigation in the Supreme Court of the State of New York, New York County, under Index No. 11358/65. That Court had general subject matter jurisdiction of the state or common law claims asserted. No proceedings were held in the state action until after the June 8, 1972 settlement agreement was executed.

While the opinion of the Supreme Court declares broad doctrine in the construction of the federal securities laws, it has an extremely narrow application to this particular litigation. The Court's opinion continues (pp. 13, 14 of 404 U.S., p. 169 of 92 S.Ct.):

"The case was before the lower courts on a motion to dismiss.

Bankers Life urges that the complaint did not allege, and discovery failed to disclose, any connection between it and the fraud and that,

1. But the prior case of *A. T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967) cited with approval in footnote 7 of Mr. Justice Douglas' opinion, *supra*, had previously held:

" '[We do not] think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.' "

And Judge Hays' dissent in this case in the Court of Appeals (P. 361 of 430 F.2d) suggested a factual basis (sale of stock) to uphold the complaint, different than the one eventually adopted.

therefore, the dismissal of the complaint as to it was correct and should be affirmed. We make no ruling on this point.

The case must be remanded for trial. We intimate no opinion on the merits, as we have dealt only with allegations and with the question of law whether a cause of action as respects the sale by Manhattan of its Treasury bonds has been charged under § 10(b).[10] [(Footnote 10) Petitioner's complaint bases his single claim for recovery alternatively on three different transactions alleged to confer jurisdiction under § 10(b): Manhattan's sale of the Treasury bonds; the sale of Manhattan stock by Bankers Life to Bourne and Begole; and the transactions involving the certificates of deposit. We only hold that the alleged fraud is cognizable under § 10(b) and Rule 10b–5 in the bond sale and we express no opinion as to Manhattan's standing under § 10(b) and Rule 10b–5 on other phases of the complaint. (citations omitted)] We think it has been so charged and accordingly we reverse and remand for proceedings consistent with this opinion.

All defenses except our ruling on § 10(b) will be open on remand."

As previously noted, the effect of the fraud was to decrease Manhattan's working capital by $5,000,000.00, which rendered it insolvent, and incapable of performing its executory obligations to its policyholders, protecting them against casualty losses under existing insurance policies.

Insolvency of a casualty insurer places particular burdens on the insured, claimants against them and the public generally, far greater than that in the case of insolvency of an ordinary business. Recognizing the severe disruption caused by insurance company failures, New York, by a comprehensive statutory scheme, Insurance Law §§ 1–677, has provided for strict regulation of the manner in which the affairs of an insurance company may be conducted, has limited the writing of casualty insurance to licensed insurers, and has provided the aforementioned statutory method by which a state official, the Superintendent of Insurance, may be appointed as liquidator of an insolvent company. We discuss his status and powers when so appointed in further detail below.

For more than a decade, while this litigation and the companion state case were pending, the Superintendent administered the affairs of Manhattan, marshaled its assets and invested them, paid and discharged obligations, adjusted policy claims, and embarked upon an orderly winding up of Manhattan's corporate existence.

Following the decision of the Supreme Court in this matter on November 8, 1971, the Superintendent evaluated his position in this litigation and concluded to settle this and the companion state action for $1,000,000.00, to be paid by seven defendants (excluding New England Note Corporation, Sweeney and Bourne) and exchange releases with all defendants. He did so, by agreement dated as of June 8, 1972. His reasoned analysis in doing so finds best expression in the later report of Hon. Samuel M. Gold, a Referee appointed by the New York Supreme Court, dated June 4, 1973:

"[i]t is clear . . . that the case against Bourne, Begole and Garvin, the actual conspirators who planned and consummated the plan to have Begole purchase Manhattan's stock from Bankers Life with Manhattan's own assets, is a very strong one; and that the case against New England Note Corporation, Bourne's corporate tool, and Sweeney, who participated in covering-up the transaction after he became aware of the fraud and conversion of Manhattan's assets, is a fairly strong one. . . . However, Bourne, Begole and Garvin have died and it is clear . . . that these

five defendants are practically judgment-proof and certainly not good for any substantial judgment."

With respect to the remaining defendants, Irving Trust Company, Belgian American Banking Corporation, Belgian American Bank & Trust Company, Garvin, Bantel & Company and Bankers Life & Casualty Company, Referee Gold said *op. cit.*:

"it will be seen that the evidence involving the first three—the banks—depends on inferences to be drawn tending to indicate that they did not follow sound banking practices and were negligent, thereby facilitating the use by the conspirators of their banking services to consummate their plan. Garvin, Bantel [& Company] appears to be involved only as the means by which Garvin made arrangements with the banks. Bankers Life, Manhattan's sole stockholder, which sold its Manhattan stock to Begole for $5,000,000.00, consisting of an Irving Trust check, is not shown by any evidence in the voluminous depositions and exhibits to have had any knowledge of the fact that the actual source of the $5,000,000.00 it received would be Manhattan's own assets or to have participated in or been connected with the fraud. There might possibly be a case against [Bankers Life] on some insolvency theory that, if an adequate judgment is not recovered against financially responsible defendants, it should be required to return to Manhattan that portion of the $5,000,-000.00 as is needed to make claimants and creditors whole. . . . But, the case itself as against Bankers Life on the basis of fraud or conversion is, according to all the records, entirely unsupported."

Relying on § 539(b) of the Insurance Law, quoted below, the settlement agreement of June 8, 1972 provided that the Superintendent would apply to the Supreme Court of New York County, and not this Court, for approval of the settlement, and that upon such approval the actions in both courts would be dismissed, and the settlement effected.

The Superintendent's motion for such approval was heard before Mr. Justice Markowitz of the New York County Supreme Court on October 19, 1972 and that Court, on notice to movants here, referred "the fairness of the proposed settlement" to the aforementioned Referee Gold, who was appointed as such Referee, to "hear, take evidence on the said issue and report thereon." See order filed January 2, 1973 by Justice Markowitz under New York County Clerk's Index No. 40931/63. Justice Markowitz had previously held by memorandum decision dated December 7, 1972 that he had subject matter jurisdiction to pass on the settlement by reason of the specific provisions of Insurance Law §§ 526 and 539.

Movants here were parties to the subsequent proceedings before the Referee, who received evidence, and rendered a comprehensive report dated June 4, 1973, to which reference has previously been had.

An application was made in New York Supreme Court by notice of motion dated June 7, 1973, on notice to movants here, for an order confirming the Referee's report. Also, the Referee filed his affidavit of legal services, to which the Superintendent objected. By a decision and opinion dated September 23, 1973, Mr. Justice Markowitz confirmed the "well-reasoned lucid report of the distinguished Referee." In that opinion the State Court again rejected arguments made to it by these movants that there was a want of subject matter jurisdiction to approve the settlement and discontinuance of this federal action.

On October 25, 1973, an order was entered in the State Court which approved the report of the Referee, granted the petition of the Superintendent to settle both actions, and authorized and permitted him to do so. The settlement agreement was approved and ratified by the order, and the Referee's fee duly fixed, to be paid by the Superintendent.

Movants here appealed from that order. The Superintendent also appealed from that part of the order which fixed the amount and source of the Referee's fees. On September 17, 1974 the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, unanimously affirmed the determination below, without opinion. Application for leave to appeal to the New York Court of Appeals, or alternatively, for reargument, was unanimously denied by the Appellate Division, again without opinion, on December 20, 1974. The Court of Appeals of New York denied leave to appeal on February 12, 1975. No certiorari petition was filed with the United States Supreme Court. Accordingly, the New York Supreme Court's order of October 25, 1973 is final.

In the well constructed brief submitted by movants here, the questions presented are stated as follows:

1. Can the defense of res judicata predicated upon the determination of the State Court approving the settlement, be asserted in this court to justify a dismissal of the action without any hearing on the merits?

2. Did the State Court violate the procedural and substantive constitutional due process rights of MCC, its creditors, and the sole stockholder of MCC?

3. Did the State Court have power to pass upon the fairness and reasonableness of the settlement of the exclusively federal claim predicated upon the defendants' violation of Sec. 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder, and to authorize the dismissal thereof?

4. Does the determination of the State Court disregard the holding of the United States Supreme Court in *Supt. of Insurance v. Bankers Life,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)?

5. Was the decision of the State Court made in disregard of provable fact and Federal and State law, thereby giving a windfall to wrongdoing defendants at the expense of MCC, and the creditors and sole stockholder of MCC?

6. Was the determination below predicated upon a novel question of law created by the State Court in violation of established principles of Federal and State law?

7. Should the settlement be disapproved by this Court?

I

For purposes of considering the question of movants' standing here, and determining whether there is a federal interest which must be protected here notwithstanding the aforementioned determination of the State Court, and the prior decision to settle by State appointed fiduciary, we put aside any consideration of the merits of the settlement. For the argument, notwithstanding the well reasoned opinion of Referee Gold, confirmed by Supreme Court Justice Markowitz, and affirmed on appeal by the Appellate Division of the New York Supreme Court, we assume that the settlement to be made is improvident and inadequate, and that movants are aggrieved thereby.

II

This action is a private action.[2] Manhattan is a privately owned corporation.

---

2. As noted in Jennings and Marsh, *Securities Regulation* (1972 ed.), p. 1059:

"Neither the statute nor the Rule purports to give any private right of action to a person injured by a violation thereof, but merely makes certain conduct 'unlawful.' Since other sections of the Securities Act of 1933 and the Securities Exchange Act of 1934 which were intended to create civil liability carefully spell out that liability and its limitations, it can be forcefully argued that Section 10(b) was

not intended to create any civil liability. However, every case which considered the question had held, in accord with [*Fratt v. Robinson,* 203 F.2d 627 (9th Cir. 1953)] that a private right of action is available for a violation of the Rule, and this question was finally settled by the United States Supreme Court in *Superintendent of Insurance v. Bankers Life and Casualty Company,* 404 U.S. 6, 92 S.Ct. 165, 30 L. Ed.2d 128, which disposed of it casually in a footnote."

If it were other than an insurance company, this litigation could have been brought by its successor management, or by an assignee for the benefit of creditors existing under state law.

■ If, the Superintendent were a private party who had been defrauded in the typical § 10(b) case, *e. g.* a ribbon clerk who had been plundered of his life savings by a bucket shop, he could, whenever satisfied by the terms of an out of court settlement proposed to him by the wrongdoers, settle and discontinue his action.[3]

Movants urge that simply because a complaint in this case states a good claim under § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), the state court has no jurisdiction to pass upon the fairness and adequacy of the settlement. They rely principally on the plain meaning of § 27 of the 1934 Act (15 U.S.C. § 78aa). That statute clearly grants to the District Courts of the United States exclusive jurisdiction of violations of § 10(b). Movants then argue that because the state court lacks subject matter jurisdiction of the § 10(b) claim, any final decision of the state court approving a settlement of the § 10(b) claim should not have *res judicata* effect in the federal court.

■ This is a *non sequitur* of the worst sort. While the state court cannot adjudicate a § 10(b) claim, it can adjudicate the reasonableness and propriety of the exercise of his discretion by the State's fiduciary in settling such a claim.

■ Here, the Superintendent is a state representative fiduciary acting for the state court. *Knickerbocker Agency v. Holz,* 4 N.Y.2d 245, 173 N.Y.S.2d 602, 149 N.E.2d 885 (1958).[4] The relief he sought from the state courts was the authority to settle. The state courts did not thereby adjudicate the § 10(b) claim, they adjudicated rather, the question of whether the Superintendent was acting fairly and reasonably in the exercise of his discretion in concluding to accept a settlement proferred to him by such of the alleged wrongdoers in this case who remain solvent.

■ The interest at stake in the management and liquidation of insurance companies such as Manhattan is exclusively a state interest. Federal public policy is found only in the acts of Congress and in federal court decisions. In none of these do we find any conflicting or overriding policy of a federal nature which interferes with the state's activities in regulating the insurance industry or the administration of defunct insurers, or preventing the state's liquidator from compromising any civil claim. See Insurance Law, § 510 *et seq.* Indeed, New York holds [*Knickerbocker Agency v. Holz,* 4 N.Y.2d 245, 250, 173 N.Y.S.2d 602, 606, 149 N.E.2d 885, 888 (1958)] that:

> "Article XVI of the Insurance Law (§§ 510–546), insofar as it relates to the liquidation of insolvent insurance companies, is intended to and does furnish a 'comprehensive, economical, and efficient method for the winding up of the affairs' of such insurance companies by the Superintendent of Insurance (*Motlow v. Southern Holding & Securities Corp.,* 8 Cir., 95 F.2d 721, 724, 119 A.L.R. 1331). Those provisions of the Insurance Law 'are

---

3. Court approval granted to stipulations entered upon such settlements where plaintiffs are *sui juris* and suing in their own right, is formal only, and required in this District solely for the purpose of maintaining docket control. Indeed, such orders may be signed by the Clerk of the Court, although such practice has fallen into disuse since the adoption of the Individual Assignment Calendar. See Rule 12(b) of the General Rules

for the Southern and Eastern Districts of New York.

4. The status of the Superintendent as liquidator is that of a New York State statutory receiver, acting under the supervision of the New York Supreme Court, *Tolfree v. New York Title & Mortgage Co.,* 72 F.2d 702, 704 (2d Cir. 1934); *Matter of Lawyers Mortgage Co. (Russell),* 293 N.Y. 159, 56 N.E.2d 305 (1944).

exclusive in their operation and furnish a complete procedure for the protection of the rights of all parties interested' (*Matter of Lawyers Title & Guar. Co.*, 254 App.Div. 491, 492, 5 N.Y.S.2d 484, 486). When an insurance company is, or may become, insolvent, the Superintendent of Insurance may, under article XVI, apply to the Supreme Court for an order of liquidation (Insurance Law, §§ 513, 526). Under the order of liquidation, the Superintendent of Insurance is vested by operation of law 'with the title to all of the property, contracts and rights of action' of the defunct insurance company (Insurance Law, § 514). The Supreme Court, in the liquidation proceeding, must take cognizance of the interests of the policyholders, creditors, stockholders, and the public (Insurance Law, § 526), and it may issue such orders 'as may be deemed necessary to prevent interference with the superintendent or the proceeding, or waste of the assets of the insurer' (Insurance Law, § 528). Clearly does the plan emerge that the Supreme Court, with the agency of the Superintendent of Insurance, was intended to have exclusive jurisdiction of claims both for and against an insurance company in liquidation."

■ In short, insofar as concerns movants, the state court had the jurisdiction and power to enforce state policy and be wrong, if, as is claimed here, it was wrong, in approving the settlement, and no federal interest exists which requires this Court to override that determination.

*Motlow v. Southern Holding & Securities Corp.*, 95 F.2d 721 (8th Cir. 1938) involved a controversy similar on its facts. There Motlow, a creditor of a New York insurer being liquidated under the same statutory procedures as is Manhattan, sought to enforce claims of the insurer against those who had procured a fraudulent transfer of its assets, thereby rendering it insolvent. The Superintendent of Insurance of New York, as liquidator of the insurer, had failed and refused to attempt to recover the assets said to have been transferred wrongfully. In affirming a decree dismissing the bill, the Court held (pp. 724–25):

"The statutes of New York relative to the liquidation of insolvent insurance companies [statutory citations omitted] are intended to and do furnish a comprehensive, economical, and efficient method for the winding up of the affairs of domestic insurance companies by the superintendent of insurance of New York for the benefit of all creditors. The liquidation is intrusted to the official of the state who should be best qualified by training and experience for that purpose. Liquidation is effected by an order of the Supreme Court of the state of New York. Sections 403, 404. Upon the entry of such an order the superintendent of insurance, as liquidator, becomes the statutory successor of the corporation and is vested by operation of law with title to all of its assets, including choses in action. Section 404, subd. 2. He is given the right to avoid fraudulent transfers and to recover property wrongfully transferred. Section 418, subd. 3. He is also given the right to sell or otherwise dispose of the real and personal property, or any part thereof, with the approval of the court. Section 421. [footnote omitted].

It thus appears that the superintendent of insurance of the state of New York, as liquidator of an insolvent domestic insurance company, is not given an uncontrolled discretion over the administration of the estate of the insolvent or over the disposition of its assets, but that his acts are measurably subject to the direction, supervision, and control of the court entering the order of liquidation.

The Circuit Court of Appeals of the Second Circuit, in the case of *Tolfree v. New York Title & Mortgage Co., et al.*, 72 F.2d 702, certiorari denied, 293

U.S. 619, 55 S.Ct. 216, 79 L.Ed. 707, has held that, by virtue of a similar order of court and article 11 of the New York Insurance Law, section 400, et seq., the superintendent of insurance became in effect a receiver under the supervision of the state court.

Whether the liquidator more nearly resembles a receiver than a trustee in bankruptcy (Glenn on Liquidation, pages 16, 17, 18), or 'the successor to the corporation, and not a mere receiver' (*Clark v. Williard*, 292 U.S. 112, 120, 54 S.Ct. 615, 619, 78 L.Ed. 1160), "or a trustee under a voluntary general assignment for the benefit of creditors" (*Clark v. Williard, supra,* 292 U.S. 112, at pg. 122, 54 S.Ct. 615, 620, 78 L.Ed. 1160), we do not consider of controlling consequence in this case.

\*    \*    \*    \*    \*    \*

Furthermore, we think there is no more reason for making the administration of the estate of an insolvent insurance company by a statutory liquidator under proceedings commenced in the court of a state, subject to the jurisdiction of other courts, than for making the administration of such an estate in the hands of an equity receiver appointed by a court, subject to the jurisdiction of other courts. The reasons for noninterference are the same in either case. Experience has demonstrated that, in order to secure an economical, efficient, and orderly liquidation and distribution of the assets of an insolvent corporation for the benefit of all creditors and stockholders, it is essential that the title, custody, and control of the assets be intrusted to a single management under the supervision of one court. Hence other courts, except when called upon by the court of primary jurisdiction for assistance, are excluded from participation. This should be particularly true as to proceedings for the liquidation of insolvent insurance companies, for the reasons adverted to by Mr. Justice Cardozo in *Clark v. Wil-*

*liard,* [supra]. See, also, Glenn on Liquidation, pages 409, 410, §§ 278, 279, 280.

In *Lion Bonding & Surety Co. v. Karatz*, 262 U.S. 77, 43 S.Ct. 480, 67 L.Ed. 871, the right of the Department of Trade and Commerce of Nebraska to liquidate the Lion Bonding Company, a domestic insurance company of that state, in accordance with the statutes of Nebraska and the orders of a state court of Nebraska entered pursuant to such statutes, free from interference by other courts, was involved; and the Supreme Court applied the rule that 'where a court of competent jurisdiction has, by appropriate proceedings, taken property into its possession through its officers, the property is thereby withdrawn from the jurisdiction of all other courts.' 262 U.S. 77, 88, 89, 43 S. Ct. 480, 67 L.Ed. 871.

In *O'Neil v. Welch*, 3 Cir., 245 F. 261, the right of the insurance commissioner of Pennsylvania to liquidate the Union Casualty Company of Pennsylvania pursuant to the statutes of that state was questioned. The court said, 245 F. 261, at page 269: 'The act of the State in bringing suit was the exercise of a governmental power; the acts of the State court in pursuing a procedure established to insure the full accomplishment of that power stand for dominion over the entire subject matter in litigation, and subject the property of the corporation to its jurisdiction for the full purpose of the judicial proceeding, which includes its possession, liquidation and distribution. We are therefore of opinion that the State court acquired jurisdiction not only of the corporation but of its property upon the inception of the proceeding, and, being first to acquire jurisdiction, is entitled to retain it until the State has wrought its function and until the jurisdiction invoked has been exhausted.'

In *Tolfree v. New York Title & Mortgage Co.*, 2 Cir., 72 F.2d 702, al-

ready referred to, the court held that the superintendent of insurance, when authorized by a state court order to take possession of property of an insuring company, became, in effect, a receiver under the supervision of the state court, and that its property was in custodia legis. The court said, 72 F.2d 702, at page 704: 'In such circumstances, under established rules of law, the federal courts should not interfere with the possession of the state court. *Lion Bonding & Surety Co. v. Karatz*, 262 U.S. 77, 43 S.Ct. 480, 67 L.Ed. 871; *Harkin v. Brundage*, 276 U.S. 36, 48 S.Ct. 268, 72 L. Ed. 457; *Farmers' Loan & Trust Co. v. Lake Street Elevated Railroad Co.*, 177 U.S. 51, 61, 20 S.Ct. 564, 44 L.Ed. 667; *O'Neil v. Welch* (3 Cir. C.C.A.) 245 F. 261; *People's Trust Co. v. United States* (1 Cir. C.C.A.) 23 F.2d 381. \* \* \*"

Within the reasoning of *Motlow, supra*, and cases cited therein, Manhattan and its property were *in custodia legis* at all times since May 1963 when Manhattan was declared insolvent and the State court order appointing the Superintendent as liquidator, previously referred to, was entered.

### III

▮ Movants assert a constitutional due process claim. This claim is based upon (1) a limitation placed upon cross-examination by the Referee, and (2) the admission into evidence before the Referee of two documents claimed to be incompetent. The Court has read the record before the Referee, and concurs in the apparent conclusion of the State Court, that the procedures followed were not so erroneous as to constitute a denial of due process, rising to constitutional dimensions; if they were, the proper procedure was to apply to the Supreme Court of the United States for *certiorari* from the final State Court determinations approving and ratifying the settlement. These issues were presented to

the New York courts. Accordingly, this Court lacks jurisdiction to review these state court determinations of federal constitutional questions. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Tang v. Appellate Division of N. Y. Sup. Ct. First Dept.*, 487 F.2d 138 (2d Cir. 1973).

### IV

Section 539 of the Insurance Law provides in relevant part as follows:

"The Superintendent may, subject to the approval of the court, . . . (b) sell or compound all doubtful or uncollectible debts or claims owed by or owing to such insurer."

A clear reading of the statute indicates that the court referred to therein means the State Court. We do not think, as movants apparently contend, that the state legislature intended thereby, nor could it, foist upon this Court, subject matter jurisdiction to adjudicate the validity of the exercise of his discretion by a state appointed fiduciary. For example, let us assume that it was necessary for the Superintendent to pursue some claim belonging to Manhattan by action in the courts of Canada, or some other foreign nation granting access to its courts by American citizens. This could readily happen where an obligor had absconded, owing Manhattan money, and was not subject to *in personam* jurisdiction in New York. Clearly, the Superintendent, to the extent permitted, would have access to the foreign court to enforce the claim. Who would argue that a fair construction of the statute, § 539, requires the foreign court to approve or disapprove a subsequent compromise?

▮ This case is neither a class nor a derivative action. Rules 23 and 23.1, F. R.Civ.P., accordingly, are inapplicable. Nor should this Court convert the suit which has been brought as an individual action, into a class action. *United States v. Communist Party of the Unit-*

*ed States*, 209 F.Supp. 132 (S.D.N.Y. 1962).

█ In our view, plaintiff Superintendent when seeking in this Court to enforce a claim of an insurance company in dissolution is entitled to all the rights of a private litigant, including the absolute right, if authorized by the State court whose agent he is, to settle or discontinue on terms he considers proper, approved by the power to which he is answerable for the discharge of his duty.

We disclaim any reliance here on the abstention doctrine, which, as the Supreme Court held in *Allegheny County v. Mashuda Co.*, 360 U.S. 185, 188, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959) is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Rather, we conclude that any controversy as to whether the Superintendent is discharging his duties adequately by settling his case, is not a controversy which is or can be properly before us.

### CONCLUSION

The motion to intervene is denied. The motion to enjoin plaintiff from settling his litigation in accordance with the approval granted him by the State Court, is also denied.

Settle order on five (5) days notice, which order may provide that the consummation of the settlement, delivery of the releases, and the filing of the stipulation of discontinuance of this action shall be stayed for a period of fifteen (15) days from the date of entry thereof, for the purpose of permitting movants, if so advised, to apply to the Court of Appeals for a stay pending appeal. Although impressed by the quality of the advocacy in behalf of movants, the organization of the arguments made, and their apparent sincerity, this Court would decline any further or additional stay, if applied for, for want of merit. See Rule 8(a), F.R.App.P.